Good morning. May it please the Court. My name is Dan Israel, and I'm representing the Klamath Indians. This case was filed in 2004. Ten months later, this Court entered its en banc decision in Skokomish Tribes. Footnote 5, it indicated, hey, look, we're looking at one particular treaty. It doesn't necessarily control all treaties. To me, the key thing I want to focus on here is that we've got a situation where this tribe was pushed off at the very top of the Klamath drainage. By the way, very typical of what happened to reservations throughout the Rocky Mountains and the plains, very different than what happened to reservations and tribes in the Northwest. They weren't allowed to leave the reservation, and the Lane and Lane documentation here makes it clear that salmon was the key component of their treaty fishing. 40,000 pounds of fresh salmon a year, 80,000 pounds of dried salmon. For Pacific Corp to prevail, their theory is that these Indians who couldn't leave the reservation somehow had to patrol 600 miles of this river from their reservation to the Pacific Ocean, even though they couldn't leave the reservation. The day that somebody went into this river and put a dam on it, boom, and this is in California, they had to strike, get in, find a court, find a lawyer, and somehow stop the construction of the dam. That's one premise. The other premise is that even though this court on three occasions, and I'll talk very briefly about it, has worked to preserve this treaty right, and Congress has enacted three pieces of legislation to preserve this treaty right, all these actions of this court and of Congress were done after 1917, after COPCO was put in place, and so all you guys were interested in was preserving the non-salmon portion of the treaty fishery. I think that also is a premise that is very difficult, because the heart of this treaty right was salmon. Now, just a few things here. For example, in Adair, this court said that that treaty right was designed to preserve a continuing fishery, and in Klamath Tribes v. Oregon Department of Fish, cited by Pacific Corp, the U.S. Supreme Court referenced the stipulation between the Klamath and the state of Oregon that it was crucial to their survival. It was crucial to their survival. For me, I recognize well that the treaty that we're dealing with preserved or reserved the right to fish for the salmon on the reservation. There's no... The question is, they've alleged that that right has been violated, and the question is, what remedies, putting aside the statute of limitation issues for a moment, what remedies are available to enforce that right, and who should enforce that right? Well, I don't know. I'm not sure the question is who, but yeah, no question. Now, if you read Skokomish, and you just read it for what it says, and I was on the en banc panel. I dissented. I was part of the dissenting group of judges in that case. If you read it, it looks like your claim is foreclosed, which is what the district court said. So why doesn't Skokomish foreclose your claim? Well, because this is an entirely different set of circumstances. But the circumstances aren't the point of Skokomish. The point is the legal rule, the rationale for the decision was that you can't enforce a treaty right against a non-contracting private or, in that case, government party. I mean, that's the rule, and the rule didn't turn on whether the fishing was a little part of the reservation on or off. I don't understand that. Well, I think that's right, but I'm asking you to – I'm bringing a little bit more history here. Look, virtually every Indian fishing case in the United States, particularly out of this Ninth Circuit, has dealt with off-reservation fishing. Yeah, but you've got to overcome the legal rule of Skokomish first. I understand, if you will. And when you get into off-reservation fishing, you automatically get into regulatory disputes with the state, okay? So there never has been a case where the question was, how do you enforce a treaty where the state is not involved, where it's a private party, except for a situation like this where you have a single agreement. It's clearer, it seems to me, because the whole – the major point of my dissenting colleagues in Skokomish was that there, the other side of the fight was a municipality. Here, it's a private party. So even the dissent doesn't help a lot. Well, but you're – I understand. But the point of it – and all of that bubbled up in Skokomish. But it doesn't – but that reflected a certain set of facts. Yes, it's true that there has not been a case like this, but it's also true there's nothing in Skokomish that prevents the use of damages when that is the appropriate remedy. And I don't know what else to say, Your Honor. You're right. That is not a case for all time and all places, okay? It just – I don't know. It just is for the Ninth Circuit on treaties. Well, but I mean, let me just make a couple more comments. I mean, you've got to realize these are pretty different treaties, too. These Indians were not allowed to leave the 1.2 million acre Klamath Reservation, okay? They were completely separated. All the off-reservation treaties are completely different. For example, that was not a permanent 3,400 acre reservation. If you look at the treaty, it basically says we're going to put you there for a while. We may move you. And it said we're going to put some money in for medicine, for doctors, for farmers. But it's not on your reservation. It's all in the region. So my point is that it didn't stick Indians in a particular spot. And so the nature of their rights and the question of who else has an obligation to is fundamentally different. Now, for example, here Pacific Corps says, and I agree with them, that there were two sets of beneficiaries here, the Indians and the non-Indians who got the Klamath out of their way of life. And, you know, they cited a case that's really right on. It's a famous case, one of the most famous of these cases. And Justice Cardozo cited that. It's a case called Shoshone Tribe v. United States. It's out of Wyoming where you had a similar kind of complete isolation of Indians versus non-Indians. And it says, quote, Loyalty of the Shoshone Tribe to the people of the United States has been conspicuous and unfaltering. A fidelity at least as constant and inflexible was owing in return. And if you look at the historic record here, okay, if you look at the 1916 COPCO correspondence, if you look at the 1917 Link Dam contract language, and if you look at the United States attempted efforts at litigation, all of them are premised on the notion of keeping the Indians whole, either by passing the- Well, that, you know, that gives you all of that. But you're still back to the fundamental question of whether a damage remedy for violation of the treaty right is available. The core, as Judge Reimer said, the core principle that we're dealing with here. Right. For example, Judge Reimer was referring to the, you know, to the rationale of this majority in Skokomish. And the majority in Skokomish read a line of cases a certain way. And the dissenters read them another way. We lost. We didn't prevail. Right. So now the rule of law in the Ninth Circuit is what the majority said in Skokomish. And there is, as you pointed out when you started out, there is a bit of language in Skokomish that there might be another treaty that might be so different or the circumstances of that treaty might be so different that it might be possible to construe a private, a remedy for damages against a non-contracting party, putting aside the question of private versus governmental. And so I think you need to demonstrate, if you can, why this treaty, the Klamath Treaty, is so different from. And I don't, you know, you're talking about history, but you've got to get to the fundamentals of the treaty, because that's where the right really comes from. Right. Well, the treaty, again, the treaty, as you said, in a way it's very simple. It's a salmon right. The treaty fishery was primarily salmon. All parties knew that salmon move up and down the Klamath River. The Klamath River is the only drainage. The only way that treaty could be, have any long-term sustaining vitality as recognized by this court in Adair is that you somehow have to leave that drainage alone. And so the question becomes, how do you protect that right? And under Skokomish, if you say you're stuck with Skokomish, you're telling these Indians they have to leave their reservation, even though the treaty said they couldn't, and patrol that 600 miles. And I'm saying that treaty, that treaty doesn't allow them to do so. Therefore, that is not an appropriate remedy in this situation. And indeed, the white people on the ground, if you will, Copco, they understood in 1916 that they had an obligation to these Indians, and they tried to do it by getting them fish. And the same thing in 1917. They understood they had an obligation when they pulled that reef at the bottom of the lake. They said they would compensate. They used the word, they would incur liability. I mean, that's not, that's language of keeping the Indians whole. That's recognition that the Indians couldn't stop the construction of these dams. I don't know how else. Let me ask you this. Let me put the question a little bit differently. What was the right that the Indians were trying to protect in Skokomish? What was the right? Yes. Well, again, they had multiple fishing grounds. Okay? And as far as I can tell, they knew they could, they knew that based on Winans and Surfr brothers, that they had some kind of right of access at these multiple grounds. And they went the next step further and said, hey, we didn't, you know, I don't know if they claimed, I guess they must have inherently claimed they lost their right of access. So they said, we're going to try to get money. Okay? And I think, you know, I'm a lawyer. To me, that was a reach because they lost one of their many, many off-reservation fishing grounds. They didn't get there in time to stop it, apparently, but they had others. These guys, they don't have that option. And everybody understood that from the get-go. So I will save some time. All right. Mr. Curtis. May it please the Court. I'd like to make two essential points this morning. First, this Court's en banc decision in Skokomish does control the outcome here. Mr. Israel is correct that the en banc majority cautioned that every case must turn on the specific treaty involved. However, I disagree with Mr. Israel that these two treaties were fundamentally different. They were not. The 1864 Klamath Treaty and the 1855 Skokomish Treaty are identical in all material respects. They were both bilateral agreements between the federal government and a tribe. They had the same structure. They had the same language. And, Your Honor, in answer to your question, they reserved the identical right. The right in both treaties was that both treaties secured, and that was the language, secured the right of taking fish. If, as a matter of law, there was no implied cause of action for damages against a non-treaty party in Skokomish for interfering with the secured right of taking fish, there can be none here. The second point I'd like to make. Does it make a difference that the secured right here with the Klamath was their right to take the fish from the reservation? I think it makes no difference at all. As opposed to sharing that right in common with non-tribal members. I don't see any difference in those rights, Your Honor. As the Supreme Court said in Fishing Vessel, the language about a secured right of taking fish gives members of the tribe an interest in a portion of the available fish themselves. So, whether on reservation or off, we're talking about an interest, a reserved interest in the available fish. I don't think it makes a difference as to whether it's on or off, whether there are many usual and accustomed fishing places or only one. Now, that might go to the question of has there been an injury. If a tribe has 100 different fishing places and only one is lost, perhaps there's no injury or perhaps it goes to the question of damages. But it can't go to the question, the underlying question of subject matter jurisdiction or whether there is an implied cause of action. I might mention, Your Honor, that Mr. Israel has said that the degree of harm was much more severe on the Klamath Reservation than the Skokomish Reservation. Now, as I said, I don't think that makes any difference, but I would point out that even if jurisdiction turned on the degree of harm, the Skokomish rights were hugely important to that tribe. The Supreme Court in Winans, in talking about this off-reservation reserved right, said that that right was as important to the tribal members as the atmosphere they breathed. I don't see how the right here can be much more important than that. Moreover, look at what the tribe in Skokomish alleged. I refer to footnote nine of the en banc decision. In footnote nine, the majority noted that the Skokomish claimed that the diversion of the Skokomish River by the city of Tacoma destroyed the most significant fish-producing stream of the Skokomish River system. This wasn't simply one out of a hundred fishing places. The allegation was that it was the most significant fish-producing stream. And in addition, the court noted in Skokomish at the outset, Skokomish tribe was seeking $5 billion in damages. That was the alleged amount of damages. Here it's a billion. Now, I simply don't see how, again, subject matter jurisdiction or an implied cause of action can turn on how much the alleged damages are or the degree of injury. The second point, overarching point I wanted to make was I think the jurisdictional history of this case presents an even more compelling case than Skokomish for denying an implied cause of action, and that's so for three reasons. First of all, Your Honor referred to this is a private party. Whereas in Skokomish, we were talking about a claim against governmental entities, city of Tacoma and the public utility. The disagreement between the majority and the dissent was whether and to what extent governmental entities that were not parties to the treaty could be held liable in damages. The public versus private distinction is crucial and I think takes this case far beyond Skokomish. Moreover, whereas Skokomish involved only a minor part license, and here I'm referring, I think it was footnote four in the majority decision, involved only a minor part license from the Federal Power Commission, and therefore the usual rules of FERC preemption, exclusive jurisdiction, and so forth did not apply, this case involves a major federal license, one that since the 1950s has authorized and comprehensively regulated this very dam, and therefore all the usual rules of preemption, collateral attack, and exclusive jurisdiction apply. And finally, unlike the Skokomish tribe, the Klamath was a federally terminated tribe for 25 years between 1961 and 1986. During that time, the tribe's claim for historic monetary damages dating back to World War I was subject to state statutes of limitation rather than federal limitations, and that claim was extinguished. And the extinguished claim was not revived in 1986 when tribal recognition was restored. I mentioned the jurisdictional history of the dam, and I'd like to go into just a little bit more detail about that because the Supreme Court has emphasized, for example, in the City of Sherald case that it's important to look at the jurisdictional history. The conduct here was the construction of one single dam, Topco No. 1. Now, Mr. Israel, in his remarks, began talking about the Link River Dam and an agreement dealing with the Link River Dam. Mr. Israel conceded in his reply brief at page 9 that the Link River Dam was no longer involved. The original claim here dealt with three dams, two different claims. The briefs demonstrate that two of the dams have the claims dealing with two of the dams have now been abandoned, Link River and Keno, and one of the claims, the habitat degradation claim, has been abandoned. So we're only talking about one dam and the issue of fish passage. Now, on the jurisdictional history, Topco, during World War I, didn't simply unilaterally give up on attempting to provide for fish passage. It's undisputed that the State of California ordered Topco to stop trying to create fish passage, stop focusing on that, and instead to provide various mitigation facilities in lieu of fish passage. The State-ordered mitigation included a state-of-the-art, for that time, fish hatchery that the State took over and which was intended to provide fish for both north and south of the dam. And the record shows that, at least for a period of time, California and Oregon worked together to share the fry from that fish hatchery. Those efforts tapered off during the Great Depression and ended. But that was a government issue, not the fault of Topco. Topco did what the State of California ordered it to do. And then during the Eisenhower administration, when the Federal Power Commission took jurisdiction over the dam, the FPC embraced the same model, the very same approach. The licensee had to provide various mitigation measures in lieu of fish passage. Those evolving mitigation requirements were spelled out in a long series of FPC orders. We cite them in footnote four of our brief. The Federal Government could have required fish passage at any time, either through the project license or the Secretary of the Interior had the The Federal Government could have sued, brought suit. And Mr. Israel has noted in his brief that, indeed, some employees of the Department of Justice in the 1940s and 50s looked at a possible lawsuit dealing with this very dam. The salient point is the Federal Government rejected that lawsuit, didn't deem it justified. Well, they'd be in a pretty hard position to mount a lawsuit after they authorized the building of the dam. They're not going to do that. Can I just take you back to Skokomish for just a moment? Do you still read Skokomish as allowing injunctive relief based on a treaty right? I read Skokomish as, yes, allowing injunctive relief. The majority emphasized that injunctive relief was available and damages against, at least against the United States. And so when Mr. Israel says there's nothing, you know, if you don't recognize this right, there's nothing that can be, if you don't recognize a cause of action for damages against a private licensee, there's nothing that can be done, that's simply not true. Do you read Skokomish also as foreclosing any possibility under any circumstances of getting damages either against a governmental, a non-U.S. governmental entity or a private party based on a treaty right violation? Right. I don't because the majority did emphasize, Your Honor, that you have to look at every treaty on its own terms. And there may well be treaties that require a different outcome. My point is simply that when you line the two treaties up, they're identical in all respects, including the exact right, the secured right of fishing that was reserved. So I don't. And you see no difference in that the Klamath was sort of limited to their, were, you know, stuck on their reservation. You know, this Nekomish apparently traveled to, they had to travel to get their, exercise their fishing rights to go to different locations. Right. But for the Klamath, they could exercise their fishing rights right there on their reservation. They were more limited, I guess, in where they could fish. Does that make any difference? Again, that may go to the extent of injury or the degree of damages, but I don't see how that can affect subject matter jurisdiction itself, because there was the same right involved. Vindicating the reserved right to fish. Vindicating the reserved right, the secured right of taking fish. You simply cannot, it seems to me, have a rule of jurisdiction that turns on, you know, was this in Washington and Oregon? Was it off reservation or on reservation? Was there one dominant fishing area or a hundred? Again, those go to injury and damages, but it seems to me not subject matter jurisdiction. Going back to the mitigation in lieu of fish passage, both California and the Federal Power Commission was simply authorizing the regulatory model that prevailed for most of the 20th century. And that is when a dam was built and it was too high to allow fish passage, the regulators would allow the dam to be built, but require the dam builder to provide mitigation facilities in lieu of fish passage. That's the model that the U.S. Supreme Court approved of in FPC versus Oregon in 1955. This court repeatedly approved of that model, and indeed this court once before has looked at this very dam in Pacific Power and Light, which is one of the predecessors of Pacific Core. In 1964, this court said that the license grants a privilege to the private owner to block fish passage, provided that the owner provides mitigation in lieu of fish passage. Counsel? Yes, sir. While you're at a stopping point, as I looked at your red brief, you seem to be relying on the fact that the dam has been licensed and relicensed over the years as impairing or impacting or prohibiting a claim for damages against the utility. Is that part of your claim here? Yes, it is, Your Honor. Okay, I'd like to have you explain to me then the language in the Federal Power Act itself. Does the Federal Power Act itself seem to leave with the licensee the obligation to pay damages? No, Your Honor, not in this instance. As this court in Comish held, Section 10C, 803C, does not create a private cause of action for damages. Instead, it simply preserves traditional state court law remedies, for example, for the flooding of a reservation. This court, in holding that, followed a number of other circuits that have reached the same conclusion. There is no common law, federal common law action, for damages against a licensee for damages caused by off-reservation activities that may harm on-reservation natural resources. I agree that the preservation in 10C of traditional state court law remedies might, for example, if the dam flooded the reservation, a state cause of action might lie. But, and this is one of the points in our brief, there is no federal common law action for damages against private parties. And I'd refer the Court, in particular, to the Supreme Court's recent decision in Sherrill. Sherrill is the next Supreme Court case after Oneida II, deals with the same treaties. And Sherrill clarified what the Court in Oneida II meant when it recognized a federal common law action for damages. The Court in Sherrill emphasized that Oneida, and I might emphasize Oneida II is really the foundation of much of Mr. Israel's argument, and it was the foundation of much of the dissent in Skokomish. The Court in Sherrill emphasized that the federal common law action for damages in Oneida II was only against a governmental entity, not against a private party. And the Court in Sherrill approvingly noted that the lower courts after Oneida II had refused to allow that common law action to be extended to private individuals, who over many, many, many generations had relied on the state of New York and the federal government. So I'm not aware of any case that has ever recognized a cause of action against private parties for off-reservation activities that interfere with a fishing on the reservation. And indeed, every case of which I'm aware, that's purse, this court's 1983 decision in the state of Washington, which was vacated. And a number of other cases cited in our brief, all held that there is no such right. So I think 10C really has no bearing here, Your Honor. If I may just add a couple words about the statute of limitations. Again, in addition to the public-private distinction, in addition to the authorization here by the state and federal governments, there is a very unique statute of limitations at work here. The Klamath was a terminated tribe. The Supreme Court's decision in Catawba, which came a year after Oneida II, is really squarely on point. Catawba was a case dealing with a treaty rights cause of action for both injunctive and damages relief to natural resources, not just fish, but 225 square miles of land, water, natural resources, and so forth. And when the Catawba were terminated as a tribe, Justice Stevens, writing for the court, said that made state statutes of limitation applicable. And the treaty rights claim was barred under South Carolina statutes of limitation. It's the same issue here. The restoration of the Klamath did not restore the cause of action. Both this Court and the U.S. Supreme Court have said repeatedly that where a cause of action has been extinguished by the statute of limitations, you cannot retroactively revive a time-barred claim. Kagan. Thank you, Mr. Curtis. Your time has expired. Okay. Mr. Israel. Well, Your Honor, I'm going to have to make another run. First of all, yeah, let's just talk quickly about the statute of limitations. I, you know, Pacific Corps failed to note twice the footnote in Catawba tribe that said, hey, look, this is different than Menominee. And Kimball, of course, wrote a piggyback on Menominee. Menominee is different because it preserves fishing rights, and you've got public law 280. Now, you guys can do with that what you want, but please look at it. They've ignored it. More importantly, I don't think this was pointed out before, but in the Restoration Act, look at the following sentence. I think this is under Landgraf. You don't have to get to retroactivity under Landgraf. There's specific direction by comments, okay? I would contend that even if Pacific Corps is right, that somehow Catawba applies here, this language, and the provisions of such act, which is the Termination Act, to the extent that they are inconsistent with this act shall be inapplicable to the tribe and to members of the tribe after the date of the enactment of this act. Now, I didn't really see this until this argument. The district court kind of talked about the restoration part of that paragraph, but I would make the argument that that is specific direction that Congress is saying after this 86 Act, nothing that happened in termination is on the table. And so Landgraf says the general rule is the regime in place at the time of the action controls, and I'm saying you've got that rule, plus you've got this specific direction by Congress, and therefore the Chenault case, for example, which is a very different set of facts, should not apply. Another question I have is the Pacific Corps says the government said, hey, look, we're going to bring the suit, and now we're not going to bring the suit because it's not justified. But if you look at their supplemental excerpts of record, they didn't really tell you the whole story. They said it was not felt the institution of suit was justified unless we had further assurance that the alleged damages suffered by the Indians could be proved. So that doesn't go to a cause of action. That's the Justice Department saying we want proof. And, of course, Lane and Lane in 81 was the effort to try to develop that proof. They said it a second time. We do not feel the evidence at hand is sufficient to establish the damages claimed by the Indians. So I think it's fair to say that you've got the United States, God bless it, at some point wanting to go forward on a damage case here, but being held back not because of a cause of action, not because of, you know, well, because of a lack of damages, damage proof. I want to go back on Link Dam. Yes, we have not kept our cause of action under Link Dam, but the specific provision in paragraph 7 said in 1917, we are liable to the Indians for any damage. That's part of the understanding of the parties and that still is in front of the court. Pacific Corp said, hey, you didn't provide the document, but I have copies here. But let's go back to the heart of this. And I've got to respectfully disagree with Pacific Corp. These are not the same treaties. This is a permanent fixed reservation, okay, like Shoshone tribe, like Justice Cardozo understood. You separate.  How, they cannot police this river. Tacoma should, of course, recognize an implied cause of action. That's what injunctive relief is. The question is, what is the appropriate form of that implied cause of action? This court didn't say there was no implied cause of action. It just said, we're not going to recognize damages. And I don't, I mean, you're looking at me like I haven't yet convinced you, and I'm trying to figure what additional arguments I can make, Your Honor. But, look, you've got treaty. Why would this court in Adair and in Kimball reach so hard to preserve this treaty right if it was only dealing with non-anadromous fish? Because everyone knew that it was salmon, which was critical. And why would Congress in the Termination Act and the public law 280 and restoration keep hammering away at the preservation of these treaty rights, knowing under Pacific course theory that, of course, the most valuable component had been lost forever in 1917, and there was no way to make the Indians whole. So, you know, it seems to me, and I would only ask you as you consider this case, take a look at that 1855 treaty. It's a typical Stevens treaty. It's a small place, temporary residence, and the whole idea was, you guys were going to come out and live with us. The Klamaths couldn't live with the white men. They had to immediately get over to that reservation. That's not true on the face of the 1855 treaty. The Suquamish folks were allowed to intermingle, and they had a common federal agency. I mean, it's just a very different treaty, and if this Court wants to do ‑‑ if this Court is going to go forward with the notion of implied right of action, all we're saying is, in this particular case, you've recognized implied rights of action elsewhere. No one says that they're not available. The question is what kind, okay? And I think here, if you turn us down, you're saying you guys couldn't leave the reservation, but somehow it was your job in 1916 to get yourself down to California and stop this dam. Now, Sherrill. Look, Oneida was a test case against a couple of counties, okay? That's why the counties were defendants, and they recognized damages. Sherrill is an equitable case, and the Supreme Court said, We're not, after 200 years, going to disrupt the lives of these folks, but we are preserving damages against the defendant counties. The final thing is I think Suquamish and Sherrill were reaches by tribes that were unreasonable. I think this Court has to decide whether this tribe asking for damages is a reach or really is the appropriate way to protect its treaty right. Thank you very much. Thank you. We very much appreciate your thoughtful arguments. Half of both counsel and the matter just argued will be submitted.
judges: Rymer, T.G. Nelson, Paez